UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| DUKE'S INVESTMENTS LLC,<br><br>          Plaintiff,<br><br>     vs.<br><br>ELIZABETH A. CHAR, M.D., IN HER<br>OFFICIAL CAPACITY AS THE<br>DIRECTOR OF HEALTH OF THE HAWAII<br>STATE DEPARTMENT OF HEALTH; AND<br>HAWAII STATE DEPARTMENT OF<br>HEALTH,<br><br>          Defendants. | CIV. NO. 22-00385 LEK-RT |

**ORDER DENYING PLAINTIFF'S REQUEST
FOR A TEMPORARY RESTRAINING ORDER**

On August 22, 2022, Plaintiff Duke's Investments, LLC ("Plaintiff") filed its Verified Complaint for Declaratory and Injunctive Relief with Request for a Temporary Restraining Order ("Complaint"). [Dkt. no. 1.] Before the Court is the portion of the Complaint seeking a temporary restraining order ("TRO Motion"). Defendants Elizabeth A. Char, M.D., in her official capacity as the Director of Health of the Hawaii State Department of Health, ("Char") and Hawaii State Department of Health ("DOH" and collectively "Defendants") filed their memorandum in opposition on October 21, 2022, and Plaintiff filed its reply on November 4, 2022. [Dkt. nos. 19, 20.] The Court finds this matter suitable for disposition without a

hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules").  Plaintiff's TRO Motion is hereby denied for the reasons set forth below.

## BACKGROUND

Plaintiff's "action challenges the constitutionality of Hawaii Administrative Rule ('HAR') 11-37 as amended on February 24, 2022, and thereafter further amended on April 29, 2022, and also challenges the application of a definition of 'hemp' which impermissibly narrows the definition of 'hemp' and 'hemp products' under federal law."  [Complaint at ¶ 1 (emphasis omitted).]

According to Plaintiff's Complaint, "[h]emp is from the cannabis family of plants as is marijuana."  [Id. at ¶ 10 (quotation marks and citation omitted).]  "Cannabis contains cannabinoids in quantities that vary depending upon the specific variety of cannabis plant."  [Id. (quotation marks and citation omitted).  Cannabinoids are comprised of natural compounds, including: "tetrahydrocannabinol ('THC'), the component having psychoactive properties that can produce feelings of euphoria or a 'high,' and cannabidiol ('CBD'), which is popular for treating pain, anxiety, and other disorders, including neurological diseases."  [Id. (quotation marks and citation omitted).]  THC has multiple isomeric forms, such as delta-8 THC, delta-9 THC,

2

and delta-10 THC.  [Id. at ¶ 11.]  "Delta-9 THC is the primary cannabinoid isomer that causes a psychoactive reaction in humans when it is consumed at certain concentrations and at certain levels.  Delta-8 THC and Delta-10 THC are naturally occurring cannabinoid isomers in the Cannabis sativa L. plant."  [Id.] Hemp and marijuana are different plant varieties of the Cannabis sativa L. plant.  Hemp, unlike marijuana, has a low concentration of delta-9 THC.  [Id. at ¶¶ 12-13.]

The Agricultural Act of 2014 ("the 2014 Act") "defined 'industrial hemp' as the plant 'Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis.'"  [Id. at ¶ 14 (quoting 7 U.S.C. § 5940(a)(2)).] Plaintiff alleges the Federal Agriculture Improvement Act of 2018 ("2018 Farm Act") amended the Controlled Substances Act ("CSA") in two ways.  [Id. at ¶ 15.]  The 2018 Farm Act "amended the definition of 'marijuana' in the CSA to exclude hemp and classify it as an ordinary agricultural commodity[,]" and "amended Schedule I of the CSA to exclude the THC found in hemp from the definition of 'tetrahydrocannabinols.'"  [Id.]  Under the 2018 Farm Act, "'hemp' means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and **all derivatives**, **extracts**, **cannabinoids**, **isomers**, **acids**, **salts**, **and salts of isomers**, whether growing or not, with a delta-9 [THC]

3

concentration of not more than 0.3 percent on a dry weight basis." [Id. at ¶ 16 (emphasis in Complaint) (some internal quotation marks omitted) (quoting 7 U.S.C.A. § 1639o(1)).

Plaintiff further alleges that, under the 2018 Farm Act, delta-8 and delta-10 are excluded as controlled substances by definition. See id. at ¶ 17. As such, "any downstream product made from hemp, any hemp derivative, cannabinoid, isomer, acid, salts or salts, that has a delta-8 or delta-10 THC concentration of any amount, is a legal product derived from hemp." [Id. at ¶ 20.]

"On August 9, 2021, the State of Hawaii enacted HAR 11-37 and officially adopted the 2018 Farm Act's definition of hemp. In doing so, under HAR 11-37, hemp and THCs in hemp were removed from the schedule of controlled substances and the definitions of 'marijuana' and 'tetrahydrocannabinols.'" [Id. at ¶ 21.] "After HAR 11-37 was adopted, Plaintiff opened 8 retail locations throughout Honolulu dedicated to the retail sale of legal hemp and THC products derived from hemp." [Id. at ¶ 23.] Plaintiff asserts that "[a]ll the products and raw materials that [it] sells, packages, and distributes, both at retail and wholesale, are purchased from suppliers in other states, and then transported to Hawaii." [Id.]

Plaintiff alleges the DOH "quietly amended HAR 11-37 on February 24, 2022 (the 'February Amendment')" without advance

notice.  [Id. at ¶ 24 (emphasis omitted).]  Plaintiff also
asserts the February Amendment directly violates the 2018 Farm
Act because the February Amendment changed the definition of
hemp to prohibit "'cannabinoids created through isomerization,
including delta-8[ THC] and delta-10[ THC].'"  [Id. (emphasis
omitted).]  On April 29, 2022, the DOH amended HAR 11-37 again
("the April Amendment"), without notice, to change both the
definition of "'total THC'" and "the requirements for laboratory
analysis of hemp products."  [Id. at ¶ 26.]  Plaintiff alleges
the February Amendment and the April Amendment violated Haw.
Rev. Stat. § 91-3(a), which requires the DOH to, among other
things, give the public notice of any proposed amendment and
allow the public an "opportunity to submit data, views, or
arguments, orally or in writing."  See id. at ¶¶ 28-29 (quoting
Haw. Rev. Stat. § 91-3(a)(2)).

     Plaintiff alleges the DOH inspected two of its
business locations on April 18, 2022 and May 5, 2022.  The DOH
found Plaintiff to be in compliance and did not inform Plaintiff
that HAR 11-37 had been amended or that its products violated
HAR 11-37.  [Id. at ¶ 27.]  Plaintiff alleges it would have
"availed itself of the opportunity to speak in opposition to the
proposed reversal of law, or at a bare minimum, prepare itself
for a possible change in its business operations to ensure that

it maintained legally compliant business practices." [Id. at
¶ 30.]

On June 24, 2022, the Honolulu Police Department
("HPD") and the DOH raided Plaintiff's retail locations and
arrested two employees.  The two employees were subsequently
released, and neither have been charged.  [Id. at ¶ 31.]  The
DOH allegedly embargoed Plaintiff's inventory, which was valued
at around $200,000.  [Id. at ¶ 32.]  Plaintiff asserts it
requested a hearing to challenge the embargo, but it was
informed that the embargoed inventory was transferred to HPD as
forfeited evidence.  [Id. at ¶ 33.] Plaintiff also alleges that,
because its lease agreements contain prohibitions against any
illegal use of the premises, the amendments to HAR 11-37 has
made the lease agreements void as a matter of law and Plaintiff
now faces threats of eviction.  [Id. at ¶ 36.]

Plaintiff alleges the following claims: (1) a claim
seeking a declaratory judgment that Defendants violated Haw.
Rev. Stat. § 91-7; (2) a claim seeking a preliminary injunction
and a declaratory judgment that Defendants violated Plaintiff's
procedural due process rights under the Fourteenth Amendment of
the United States Constitution; (3) a claim seeking a
preliminary injunction and a declaratory judgment that
Defendants violated Plaintiff's substantive due process rights
under the Fourteenth Amendment; (4) a claim seeking a

preliminary injunction and a declaratory judgment that Defendants violated Plaintiff's right to equal protection of the law under the Fourteenth Amendment; (5) a claim seeking a preliminary injunction and a declaratory judgment that Defendants violated the Federal Agriculture Improvement Act of 2018; and (6) a Fifth Amendment Taking Clause claim.[1]  Plaintiff seeks a temporary restraining order to enjoin Defendants from enforcing the February Amendment and April Amendment to HAR 11-37.  Defendants argue Plaintiff's TRO Motion should be denied.

## **STANDARD**

The standard applicable to a request for a temporary restraining order ("TRO") and the standard applicable to a request for a preliminary injunction "are substantially identical."  Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam) (citation and internal quotation marks omitted).

> In order to obtain a preliminary injunction a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20,

---

[1] Plaintiff alleges a seventh cause of action phrased as a temporary restraining order.  Because a temporary restraining order is not a cause of action, the Court does not consider it as one of Plaintiff's claims.  The Court, instead, construes Plaintiff's request for a temporary restraining order as relief that it seeks.

129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  Under
our "sliding scale" approach, "the elements of
the preliminary injunction test are balanced, so
that a stronger showing of one element may offset
a weaker showing of another." Pimentel v.
Dreyfus, 670 F.3d 1096, 1105 (9th Cir. 2012) (per
curiam) (citations omitted).

Hernandez v. Sessions, 872 F.3d 976, 989-90 (9th Cir. 2017).

"The first factor — likelihood of success on the merits — 'is

the most important' factor." California ex rel. Becerra v.

Azar, 950 F.3d 1067, 1083 (9th Cir. 2020) (en banc) (quoting

Winter, 555 U.S. at 20).

## DISCUSSION

## I.   Likelihood of Success on the Merits

### A.   Haw. Rev. Stat. § 91-3

Defendants argue Plaintiff is not likely to succeed on

the merits because the February Amendment and April Amendment to

HAR 11-37 were made in accordance with Hawai`i law.  [Mem. in

Opp. at 10.]  The Court agrees.

Haw. Rev. Stat. § 91-3 sets forth the procedures an

agency must follow in adopting, amending, or repealing any rule

authorized by law.  Plaintiff asserts Defendants were required

to amend HAR 11-37 pursuant to the requirements set forth in

§ 91-3.  See, e.g., Complaint at ¶ 121.  Defendants contend it

was not required to amend HAR 11-37 under § 91-3, however,

because the statutory scheme regarding hemp processing is

governed by Haw. Rev. Stat. Chapter 328G.  [Mem. in Opp. at 10.]

Under Chapter 328G, the DOH "shall adopt rules pursuant to chapter 91," Haw. Rev. Stat. § 328G-4(a), but it "may adopt and amend interim rules, which shall be exempt from chapter 91 . . . ; provided that any interim rules shall only remain in effect until July 15, 2025, or until rules are adopted pursuant to subsection (a), whichever occurs sooner[,]" Haw. Rev. Stat. § 328G-4(b).

As such, the DOH states it was not required to follow § 91-3 because § 328G-4(b) gives the DOH the authority to amend rules on an interim basis.  [Mem. in Opp. at 11.]  Plaintiff states there are no indications in the August 9, 2021 version of HAR 11-37 – the version that was originally and formally adopted - that it was interim.  See Reply at 9-10.  Plaintiff misunderstands.  Although Plaintiff states the August 9, 2021 version of HAR 11-37 does not indicate that it was an interim rule, see Reply at 9; see also id., Exhibit A (HAR Title 11, Chapter 37), Plaintiff concedes that a version of the February Amendment did indicate that it was interim, see Reply at 10; see also id., Exhibit B (February Amendment).

First, § 328G-4(b) merely states that the DOH "may adopt and amend interim rules . . . ."  Haw. Rev. Stat. § 328G-4(b).  There is no requirement that the original rule being amended must have been interim itself.

Second, Chapter 328G is silent as to the definition of "interim" and does not set forth a distinction between an interim rule or non-interim rule.  "If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning."  Allstate Ins. Co. v. Ponce, 105 Hawai`i 445, 454, 99 P.3d 96, 105 (2004) (citation omitted). The plain reading of § 328G-4(b) suggests that the DOH may adopt rules and those rules are interim until the sooner of either July 1, 2025 or the rules are formally adopted pursuant to § 91-3.  Thus, the February Amendment and the April Amendment are properly considered interim rules because they have not been formally adopted pursuant to § 91-3 and July 1, 2025 has not passed.

Hawai`i case law supports the Courts interpretation. In Tanaka v. State of Hawai`i, Department of Land & Natural Resources, 117 Hawai`i 16, 175 P.3d 126 (Ct. App. 2007), the Intermediate Court of Appeals considered whether the State of Hawai`i, Department of Land and Natural Resources ("DLNR") needed to comply with § 91-3 when it, among other things, added two hunting days to each week of the game-bird hunting season on the island of Hawai`i.  There, DLNR originally complied with § 91-3 when it initially designated certain days for game-bird

10

hunting.  <u>Tanaka</u>, 117 Hawai`i at 22, 175 P.3d at 132.  However,
Haw. Rev. Stat. § 183D-3 "explicitly and unambiguously
require[d] DLNR to amend its rules affecting public-hunting
areas in accordance with HRS chapter 91."  <u>Id.</u> at 23, 175 P.3d
at 133.  Accordingly, if DLNR wanted to change the days of the
hunting season, which were set forth in a rule affecting public
hunting areas, it was required to promulgate those changes
through chapter 91.  That is, there was no carveout and,
therefore, DLNR was required to effect changes via § 91-3.
Unlike in <u>Tanaka</u>, here § 328G-4 explicitly contains a carveout
in subsection (b) that allows the DOH to promulgate interim
rules.

Because the DOH passed the February Amendment and the
April Amendment to HAR 11-37 pursuant to § 328G-4, it was not
required to pass the amendments in accordance with § 91-3.
Therefore, Plaintiff is unlikely to succeed on the merits of its
claim that Defendants violated § 91-3.

### B.   **<u>Federal Preemption</u>**

Plaintiff also asserts Defendants should be enjoined
from enforcing the February Amendment and the April Amendment
because they conflict with federal law and, thus, are preempted.
<u>See, e.g.</u>, Complaint at ¶ 103.  Defendants contend the
amendments to HAR 11-37 are not preempted by federal law.  <u>See</u>
Mem. in Opp. at 12.

The Ninth Circuit has stated:

> The Supremacy Clause of the United States
> Constitution provides that federal law "shall be
> the supreme Law of the Land; and the Judges in
> every State shall be bound thereby, any Thing in
> the Constitution or Laws of any State to the
> Contrary notwithstanding." U.S. Const. art. VI,
> cl. 2. Thus, if a state law "conflicts with, or
> frustrates, federal law, the former must give
> way." CSX Transp., Inc. v. Easterwood, 507 U.S.
> 658, 663, 113 S. Ct. 1732, 123 L. Ed. 2d 387
> (1993). . . .

Cal. Trucking Ass'n v. Bonta, 996 F.3d 644, 654 (9th Cir. 2021),

cert. denied, 142 S. Ct. 2903 (2022). Preemption

> comes in three forms: express preemption, field
> preemption, and conflict preemption. Valle del
> Sol Inc. v. Whiting, 732 F.3d 1006, 1022 (9th
> Cir. 2013). Express preemption arises "when the
> text of a federal statute explicitly manifests
> Congress's intent to displace state law." Id.
> (citation omitted). Field and conflict
> preemption, on the other hand, are types of
> implied preemption. Field preemption prohibits
> state regulation of "conduct in a field that
> Congress, acting within its proper authority, has
> determined must be regulated by its exclusive
> governance." Id. (quoting Arizona v. United
> States, 567 U.S. 387, 399, 132 S. Ct. 2492, 183
> L. Ed. 2d 351 (2012)). And even where Congress
> has not occupied the field, conflict preemption
> arises when state law conflicts with a federal
> statute. Id. at 1023 (quoting Crosby [v. Nat'l
> Foreign Trade Council], 530 U.S. [363,] 372, 120
> S. Ct. 2288[, 147 L. Ed. 2d 352 (2000)]).
> Impossibility preemption — a form of conflict
> preemption — occurs when "it is impossible for a
> private party to comply with both state and
> federal law." Id. (quoting Crosby, 530 U.S. at
> 372, 120 S. Ct. 2288).

Association des Éleveurs de Canards et d'Oies du Québec v.

Bonta, 33 F.4th 1107, 1113–14 (9th Cir. 2022).

### 1. __Conflict Preemption__

Plaintiff states conflict preemption applies because the DOH's prohibition of cannabinoids created through isomerization, including delta-8 THC and delta-10 THC, changes the definition of hemp in HAR 11-37 and directly conflicts with the 2018 Farm Act's definition of hemp. See Reply at 12. The February Amendment's definition of hemp is substantively similar to the 2018 Farm Act's definition of hemp. Compare Haw. Admin. R. § 11-37-2 (as amended February 1, 2022), with 7 U.S.C. § 1639o(1). Plaintiff, however, argues the February Amendment conflicts with the 2018 Farm Act's definition of hemp nonetheless because it prohibits the sale, holding for sale, offering, or distribution of any hemp product containing cannabinoids created through isomerization, including delta-8 THC and delta-10 THC. See Reply at 12–13; see also Haw. Admin. R. § 11-37-3(h)(12). In other words, the argument is that, although the texts of the definitions are similar, in practice the definition of hemp was changed in HAR 11-37 because the February Amendment prohibits certain hemp products beyond what the 2018 Farm Act prohibits. The Court disagrees with Plaintiff's contention.

The 2018 Farm Act explicitly provides that it does not preempt states from creating laws that "regulate[] the production of hemp . . . more stringent[ly] . . . ." See

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 297B(a)(3)(A)(i)-(ii), 132 Stat. 4490, 4910 (codified at 7 U.S.C. § 1639p).  In fact, the 2018 Farm Act "says nothing about whether a state may prohibit possession or sale of industrial hemp."  C.Y. Wholesale, Inc. v. Holcomb, 965 F.3d 541, 546 (7th Cir. 2020) ("C.Y. Wholesale I").[2]  Plaintiff argues the February Amendment conflicts with federal law because "the federal government's intent in the 2018 Farm Act was to legalize low-THC hemp . . . ."  [Reply at 14.]  But, the 2018 Farm Act explicitly "indicates that the states were to remain free to regulate industrial hemp production **within their own borders**."  See C.Y. Wholesale I, 965 F.3d at 548 (emphasis added).  Moreover, Congress's silence in the 2018 Farm Act on matters beyond regulating hemp production does not necessarily preclude the DOH from regulating areas in addition to hemp production.  See Puerto Rico Dep't of Consumer Affs. v. Isla Petrol. Corp., 485 U.S. 495, 500 (1988) ("[T]he historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (quotation marks and citation omitted)).

---

[2] The Ninth Circuit has not addressed the issues presented, the but the Court finds the analysis in C.Y. Wholesale I to be persuasive.

The February Amendment therefore did not change the definition of hemp.  It maintains a similar definition of hemp as the 2018 Farm Act but, instead, prohibits certain variations of hemp.  Derivatives of delta-8 THC and delta-10 THC, for instance, continue to fall under the definition of hemp.  That is true under either HAR 11-37 or the 2018 Farm Act.  The February Amendment, however, states that certain derivatives of hemp – though still meeting the definition of hemp – are more stringently regulated within Hawai`i.  The plain language of the 2018 Farm Act does not preclude the DOH from further regulating certain derivatives of hemp, such as "[c]annabinoids created through isomerization, including delta-8[ THC] and delta-10[ THC]."  See Haw. Admin. R. § 11-37-3(h)(12).  Plaintiff's conflict preemption argument therefore fails.

### 2.   Express Preemption

Plaintiff also raises an express preemption argument. It contends the 2018 Farm Act "expressly preempts Defendants' attempt in HAR § 11-37 to preclude transportation of hemp containing delta-8 THC and delta-10 THC."  [Reply at 14.]

### i.   Standing

Defendants first argue Plaintiff does not have standing to raise an express preemption challenge.  See Mem. in Opp. at 18.  Plaintiff does not address Defendants' standing

15

argument.  In any event, to establish Article III standing, a plaintiff

> must show that (1) "they have suffered an injury
> in fact" that is (1) "concrete and
> particularized" and (b) "actual or imminent, not
> conjectural or hypothetical"; (2) the injury is
> "fairly traceable to the challenged action of the
> defendant"; and (3) it is "likely, as opposed to
> merely speculative, that the injury will be
> redressed by a favorable decision."  Lujan v.
> Defs. of Wildlife, 504 U.S. 555, 560–61, 112 S.
> Ct. 2130, 119 L. Ed. 2d 351 (1992) (cleaned up).

Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas, 5 F.4th 997, 1012 (9th Cir. 2021) (footnote omitted).

The 2018 Farm Act's express preemption clause provides that "[n]o State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 . . . through the State . . . ."  Pub. L. No. 115-334, § 10114(b), 132 Stat. at 4914 (codified at 7 U.S.C. § 1639o note).  For licensure under a state plan, "[a] State . . . desiring to have primary regulatory authority over the production of hemp in the State . . . shall submit to the Secretary,[3] through the State department of agriculture . . . a plan under which the State . . . monitors and regulates that production . . . ."  7 U.S.C. § 1639p(a)(1).  Conversely, "[i]n the case of a State . . . for

---

[3] "The term 'Secretary' means the Secretary of Agriculture." 7 U.S.C. § 1639o(3).

which a State . . . plan is not approved under section 1639p of

this title, the production of hemp in that State . . . shall be

subject to a plan established by the Secretary to monitor and

regulate that production . . . ."  § 1639q(a)(1).

> Here, Plaintiff alleges it is a retail seller
>
> of legal hemp and THC products derived from hemp.
> Plaintiff does not produce or cultivate THC from
> hemp in Hawaii.  All the products and raw
> materials that Plaintiff sells, packages, and
> distributes, both at retail and wholesale, are
> purchased from suppliers in other states, and
> then transported to Hawaii.  Every product
> Plaintiff sold containing delta-8 THC or delta-10
> THC was produced in compliance with federal law
> and the laws of the state in which the hemp was
> produced.

[Complaint at ¶ 23.]  Defendants argue Plaintiff lacks standing

because it "does not allege that it is licensed to grow hemp in

the State or that it holds a license to produce hemp issued by

the [United States Department of Agriculture]."  [Mem. in Opp.

at 18.]  Defendants' argument is misplaced.  Plaintiff does not

need to be licensed because it does not allege it is a producer

of hemp.  Rather, for Plaintiff to have standing to raise its

express preemption challenge to HAR 11-37, Plaintiff must only

allege that it is engaged in the interstate transport of hemp

that is produced from licensed entities.  See, e.g., C.Y.

Wholesale, Inc. v. Holcomb, No. 1:19-cv-02659-SEB-TAB, 2021 WL

694217, at *6 (S.D. Ind. Feb. 22, 2021) ("Because Plaintiffs

have alleged only that they ship and transport hemp to and from

'non-licensed producers' and do not clearly allege that the hemp they ship originates from a licensed producer, they have failed to show that they are engaged in activities that come within the express preemption clause.") ("C.Y. Wholesale II").

Plaintiff's factual allegations, if proven, would be sufficient to support a finding that it has standing to challenge the February Amendment to HAR 11-37.  Plaintiff alleges it purchased hemp products containing delta-8 THC or delta-10 THC from producers outside of Hawai`i.  See Complaint at ¶ 23.  As such, Plaintiff was engaged in interstate transportation because it arranged shipments to Hawai`i from other states.  Additionally, Plaintiff alleges the hemp products it received from out of state comply with federal and state law. See id.  Although Defendants argue Plaintiff's Complaint does not contain the word "license," see Mem. in Opp. at 18, it can be reasonably inferred from Plaintiff's allegation that the hemp products it received allegedly comply with federal and state law that the hemp products must be produced by licensed entities. Plaintiff adequately alleges it has suffered an actual or imminent threat of concrete and particularized injury.  This Court therefore rules, for purposes of the TRO Motion, that Plaintiff has standing.

ii.  **Merits**

Plaintiff argues that, because the February Amendment to HAR 11-37 "prohibits the sale, possession for the purpose of sale, offer, or distribution . . . of delta-8 THC and delta-10 THC[,]" it necessarily precludes interstate transportation and therefore frustrates the 2018 Farm Act's express preemption clause.  See Reply at 14.  Defendants argue Hawai`i law is consistent with the 2018 Farm Act and is not expressly preempted.  See Mem. in Opp. at 19.  The Court agrees with Defendants.

After the February Amendment, HAR 11-37 states, in pertinent part, that "[n]o person shall sell, hold for sale, offer, or distribute any hemp product containing . . . [c]annabinoids created through isomerization, including delta-8[ THC] and delta-10[ THC.]"  Haw. Admin. R. §§ 11-37-3(h)(12).[4] The general provisions of HAR 11-37 clarifies the scope of applicability for HAR 11-37-3, stating that "[s]ubchapters 1 to 3 apply to all persons who package, label, sell, hold for sale, offer, or distribute hemp products **within the State**, including persons who import or offer for import hemp products **into the State**."  Haw. Admin. R. § 11-37-1(b) (emphases added).  The question, then, is whether the prohibition against distributing

---

[4] The April Amendment did not affect this section.

hemp products containing delta-8 THC or delta-10 within Hawai`i
frustrates the ability to engage in the interstate
transportation of hemp products, as defined by the 2018 Farm
Act.  The answer is no.  A licensed hemp producer may still ship
its hemp through Hawai`i without violating HAR 11-37 and, thus,
the express preemption clause is not implicated.  In C.Y.
Wholesale I, the Seventh Circuit stated it was "unconvinced that
the express preemption clause, standing alone, precludes a state
from prohibiting the possession and sale of industrial hemp
within the state."  965 F.3d at 547.  This Court is likewise
unconvinced.  This Court further agrees with the Seventh Circuit
that "[w]hat [the 2018 Farm Act] unequivocally does cover is the
**interstate transportation** of . . . hemp."  See id. (emphasis
added).[5]

    Here, HAR 11-37 is generally concerned with the sale
and distribution of prohibited hemp varieties within Hawai`i.
Nothing in HAR 11-37 prohibits a licensed producer from
transporting hemp through Hawai`i.  Indeed, this is not what
Plaintiff takes issue with.  Plaintiff, instead, seeks to sell

---

    [5] The contested state law in C.Y. Wholesale I concerned the
prohibition on the manufacture, delivery, or possession of
smokable hemp.  See 965 F.3d at 543.  There is no reason to
suggest that the 2018 Farm Act does not cover interstate
transportation of hemp products beyond smokable hemp insofar as
they are in accordance with the law.  See Pub. L. No. 115-334,
§ 10114(b), 132 Stat. at 4914.

and distribute the now prohibited varieties of hemp within Hawai`i once it arrives on the island.  Yet, there is "nothing in the 2018 Farm [Act] that supports the inference that Congress was demanding that states legalize industrial hemp, apart from the specific provisions of the express preemption clause." C.Y. Wholesale I, 965 F.3d at 548.  This is not a case where Plaintiff is a licensed producer of hemp attempting to ship hemp from or through Hawai`i to other states.  Although Plaintiff argues HAR 11-37 "clearly attempts to preclude the transportation (i.e., distribution) of hemp products containing delta-8 THC and delta-10 THC," [Reply at 15,] its argument fails.  HAR 11-37 makes clear that it is precluding the distribution of hemp products containing delta-8 THC and delta-10 THC within Hawai`i.  But, that does not mean hemp products containing delta-8 THC and delta-10 THC cannot be transported through Hawai`i.  In fact, the 2018 Farm Act allows Plaintiff to import hemp products from licensed producers outside of Hawai`i, including hemp products containing delta-8 THC or delta-10 THC. What HAR 11-37 prevents Plaintiff from doing is selling or distributing hemp products containing delta-8 THC or delta-10 THC once those products arrive in Hawai`i.

　　　The 2018 Farm Act does not require the State of Hawai`i to allow Plaintiff to sell and/or distribute its hemp products and, therefore, that portion of HAR 11-37 does not

conflict with the 2018 Farm Act's express preemption clause.  As such, Plaintiff is not likely to succeed on the merits of its claim that the February Amendment to HAR 11-37 is expressly preempted by the 2018 Farm Act because HAR 11-37 does not interfere with the interstate transportation of hemp products containing delta-8 THC or delta-10 THC.

## II.   **Irreparable Harm**

The Ninth Circuit has stated:

> "[M]onetary injury is not normally considered irreparable." Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1202 (9th Cir. 1980).  Nonetheless, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1474 (9th Cir. 1985).  As the Second Circuit has explained, "[t]he loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm.  What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc., 749 F.2d 124, 125-26 (2d Cir. 1984) (per curiam).  Thus, showing a threat of "extinction" is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable. Am. Passage Media Corp., 750 F.2d at 1474.

hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1188 (9th Cir. 2022) (alterations in hiQ Labs).

Plaintiff argues "the closure of [its] businesses constitutes a threatened loss that is more than purely hypothetical."  [Reply at 17.]  Defendants contend Plaintiff's

22

alleged harm "is pure speculation."  [Mem. in Opp. at 22.]  In
its Complaint, Plaintiff alleges it "is under threat of losing
its lease agreements and its businesses . . . and faces the very
real threat of both criminal and civil liability."  [Complaint
at ¶ 48.]  In its Reply, however, Plaintiff states "Plaintiff
has lost all but one of its retail locations due to lease
issues."  [Reply at 18.]  Plaintiff does not provide any
evidence to support its contention.  As alleged, although
Plaintiff's inventory worth approximately $200,000 was seized,
see Complaint at ¶ 32, this alone is insufficient to allege that
Plaintiff is facing a real threat of extinction.

       In hiQ Labs, the Ninth Circuit held that the plaintiff
had "no viable way to remain in business" because it necessarily
depended on LinkedIn's public profile data and, without such
public profile data, the plaintiff could not run its services.
See 31 F.4th at 1189.  Unlike in hiQ Labs, Plaintiff has not
alleged that there is no viable way for it to remain in
business.  Even accepting as true Plaintiff's contention in its
Reply – notably, this contention is not in its Complaint - that
hemp products containing delta-8 THC and delta-10 THC
"represented more than eighty percent of its inventory," [Reply
at 18,] Plaintiff does not allege that eighty percent of its
inventory has been seized or embargoed.  Plaintiff also does not
allege that it cannot maintain its business without an "adequate

alternative." <u>See hiQ Labs</u>, 31 F.4th at 1189.  Accordingly,
Plaintiff has not demonstrated that it is likely to suffer
irreparable harm absent a TRO.

## III. **Balance of the Equities and Public Interest**

"When the government is a party, [the public interest
and the balance of the equities] factors merge." <u>Drakes Bay</u>
<u>Oyster Co. v. Jewell</u>, 747 F.3d 1073, 1092 (9th Cir. 2014)
(citing <u>Nken v. Holder</u>, 556 U.S. 418, 435, 129 S. Ct. 1749, 173
L. Ed. 2d 550 (2009)).  "A court must balance the interests of
all parties and weigh the damage to each in determining the
balance of the equities." <u>CTIA – The Wireless Ass'n v. City of</u>
<u>Berkeley</u>, 928 F.3d 832, 852 (9th Cir. 2019) (citation and
internal quotation marks omitted).

Plaintiff argues that, "[i]f the Court does not award
the [TRO], then Plaintiff's business will suffer financial harm
or the risk of criminal prosecution." [Reply at 19.]  Moreover,
Plaintiff contends Defendants will not be harmed if the Court
issues a TRO because the TRO would "merely prohibit[] conduct
that violates the 2018 Farm Act and the United States
Constitution." [<u>Id.</u>]  Plaintiff is mistaken.  Although
Plaintiff alleges financial harm, it does not allege a threat of
extinction.  Furthermore, any risk of criminal prosecution is
speculative.  Plaintiff itself alleges "there is no pending
criminal action against any person or entity in connection with

24

the raid." [Complaint at ¶ 31.] Conversely, a TRO would disturb the status quo and prevent Defendants from enforcing HAR provisions that are not preempted by federal law. Finally, the public interest weighs in favor of Defendants because they enacted the amendments to protect the general public's health and safety. See Haw. Admin. R. § 11-37-1(a) ("The purpose of this chapter is to set forth the requirements for the processing of hemp and the sale of hemp products to provide for the protection of the health and safety of the general public."). Thus, the balance of the equites and the public interest factors weigh in favor of Defendants.

In sum, all of the Winter factors weigh in favor of Defendants. Plaintiff therefore has failed to establish that it is entitled to a TRO.

## CONCLUSION

On the basis of the foregoing, Plaintiff Duke's Investments, LLC's request for a temporary restraining order, included within its August 22, 2022 Complaint, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 22, 2022.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

DUKE'S INVESTMENTS LLC VS. ELIZABETH A. CHAR, J.D., ETC., ET AL; CV 22-00385 LEK-RT; ORDER DENYING PLAINTIFF'S REQUEST FOR A TEMPRORARY RESTRAINING ORDER